## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ATLANTIS PETROLEUM, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. _____** |
| **GETTY PETROLEUM MARKETING, INC., LUKOIL AMERICAS CORPORATION and SEMYON LOGOVINSKY,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Atlantis Petroleum, LLC brings this civil action against Defendants Getty Petroleum Marketing, Inc., LUKOIL Americas Corporation and Semyon Logovinsky, seeking a temporary restraining, preliminary and permanent injunctive relief, and damages, and in support thereof alleges as follows:

### PARTIES

1.   Plaintiff Atlantis Petroleum LLC is a Pennsylvania limited liability company with its principal place of business at 880 E. Swedesford Road, Suite 110, Wayne, Pennsylvania.

2.   Defendant Getty Petroleum Marketing, Inc. ("GPMI") is a Maryland corporation with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York.

3.   Defendant LUKOIL Americas Corporation (Lukoil Americas") is a Delaware corporation with its principal place

of business at 1500 Hempstead Turnpike, East Meadow, New York.

4.   At all times pertinent to this Complaint until February 28, 2011, GPMI was a wholly owned subsidiary of LUKOIL Americas.

5.   Defendant Semyon Logovinsky is an individual residing at 1519 Hilltop Terrace, Huntingdon Valley, Pennsylvania.

6.   At all times relevant hereto until February 28, 2011, Logovinsky was a vice president of GPMI with authority to speak on behalf of and bind GPMI.

7.   At all times relevant hereto, Logovinsky was a vice president of Lukoil Americas with authority to speak on behalf of and bind Lukoil Americas.

**JURISDICTION AND VENUE**

8.   This Court has subject matter jurisdiction over this action because it concerns GPMI's failure to comply with the requirements of section 2802 of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA"), *see* 15 U.S.C. § 2805(a), 28 U.S.C. § 1331, and involves claims and parties so related to GPMI's failure to comply with the PMPA that they form part of the same case and controversy, 28 U.S.C. § 1367(a).

9.   Venue is appropriate in this judicial district because: (a) Atlantis is a franchisee under the PMPA and does business in this district; (b) a substantial part of the events giving rise to Atlantis's claims occurred in this district; and (c) a substantial part of the property that is the subject of the Sublease at issue in this action is situated in the Eastern District of Pennsylvania.  *See* 15 U.S.C. § 2805(a) and 28 U.S.C. §1391(b),

## FACTS COMMON TO ALL COUNTS

**A.      Getty Petroleum Marketing, Inc.**

10. Getty Realty and GPMI are the principal remaining parts of the historic Getty Oil enterprise.  Until 1997, Getty Realty was one of the leading independent owner/operators of petroleum marketing assets in the country, serving retail and wholesale customers through a distribution and marketing network of Getty® and other branded retail motor fuel and convenience store properties and petroleum distribution terminals.

11. GPMI was spun off from Getty Realty in 1997 to operate and manage the petroleum distribution, marketing and retail operations.  Getty Realty retained ownership of the real estate and intellectual property on and through which the petroleum distribution, marketing and retail operations occurred.

12. After 1997, GPMI leased the real estate from Getty Realty pursuant to a long-term, unitary, triple-net lease (the "Master Lease").

13. In December 2000, Lukoil Americas acquired all of the stock of GPMI.

14. Concurrently with Lukoil Americas' acquisition of GPMI, Getty Realty renegotiated the Master Lease with GPMI. Currently, the term of the Master Lease runs until December 31, 2015.

**B.     The Founding of Atlantis**

15. Ken Morrison founded Atlantis in 2004 to provide management and operations outsourcing for Lukoil in its acquisition of Mobil-branded service stations in the Mid-Atlantic region.

16. Atlantis began operating by taking over management of 75 Mobil-branded service stations in Pennsylvania and New Jersey in May 2004.

17. Over the next two years, Atlantis rebranded all of these stations as Lukoil stations.

18. Atlantis ultimately obtained new franchisees who took over the operation of each of these stations and entered into franchise agreements directly with GPMI.  Atlantis also expended substantial effort in training the new franchisees and ensuring a smooth transition to the new operators.

**C.      Atlantis's Current PMPA Franchises**

19. Following Atlantis's completion of the transition of GPMI-owned Mobil-branded service stations to the Lukoil Brand, GPMI asked Atlantis to take over operation of the all of its service stations in Pennsylvania.

20. GPMI believed and expected that Atlantis could improve the operations and profitability of these service stations.

21. The transfer of these Pennsylvania service stations to Atlantis was effectuated through a series of agreement. These agreements incorporated, *inter alia,* the following elements:  a non-exclusive license for the use of trade marks and similar intellectual property in connection with the operations of the service stations, an agreement to supply gasoline, diesel fuel and similar petroleum products for sale at the service stations, the use of credit card equipment and systems, and a lease of the service station premises.

22. The agreements formalizing this relationship in 2006 included the following:

23. On or about August 15, 2006, Atlantis and GPMI entered into a PMPA Distributor Franchise Agreement August 15, 2006 Thru August 31, 2016 (as amended, the "Distributor Agreement," a true and correct copy of which is attached hereto as Exhibit A).

24. Pursuant to the Distributor Agreement, GPMI promised to sell to Atlantis branded petroleum products ("Products") during the term in at least specified minimum amounts.

25. In addition, GPMI in the Distributor Agreement granted Atlantis a non-exclusive, site-specific license to use of various trademarks, services marks, trade names, trade dress and other similar trade identifies in connection with the advertising, distribution, and resale of Products.

26. The Distributor Agreement specified that it would last for ten years, sixteen days – i.e., until August 31, 2016 – provided, however, that GPMI could terminate the Distributor Agreement earlier in accordance with the terms of the PMPA or upon the occurrence of certain other specified events not relevant here.

27. GPMI and Atlantis also entered into a third agreement – a Distributor Credit Card and Equipment Lease Agreement (the "Credit Card Agreement," a true and correct copy of which is attached hereto as Exhibit B) – on August 15, 2006.

28. Pursuant to the Credit Card Agreement, GPMI leased credit card reader equipment to Atlantis for use at the

service stations.  This equipment allowed customers at the stations to purchase fuel using credit cards.

29. As noted above, an essential part of the franchise relationship between GPMI and Atlantis was that GPMI subleased the service stations to Atlantis.

30. However, prior to February 2011, this sublease was not in writing.

31. In June 2006, Atlantis discussed with Logovinsky and Vince Delaurentis, another officer of GPMI, the need for a written sublease for the service stations.

32. GPMI prepared a draft of a written sublease and sent it to Atlantis in August 2006.

33. Although parties discussed various revisions to the draft sublease, the document was executed at that time.

34. Rather, GPMI's representatives insisted that they could be trusted to deal on a handshake, and that the sublease did not need to be put into writing.

35. In February 2011, however, GPMI contacted Atlantis and insisted that Atlantis executed the draft sublease.

36. Ultimately on February 8, 2011, Atlantis executed a Site and Facilities Sublease (the "Sublease," a true and correct copy of which is attached hereto as Exhibit C).

37. Notwithstanding that the document was not signed until 2011, it was dated September 1, 2006.

38. The Sublease stated that GPMI as landlord subleased to Atlantis, as tenant, various properties for use as automobile service stations and related businesses.

39. The Sublease did not, however, in fact identify specific properties to which it would apply.  It states that the subject properties are identified on Exhibit A to the Sublease, but the parties have not in fact ever prepared an Exhibit A listing the sites.

40. The stated term of the Sublease runs until August 30, 2015.

41. By its terms, GPMI may only terminate the Sublease prematurely if Atlantis defaults under the Sublease. Moreover, GPMI may only do so after it has given Atlantis notice of such default and an opportunity – ten days in the case of a monetary default or thirty days otherwise – to cure any claimed default.

42. In addition, the Sublease provides that any default under the Distributor Agreement will constitute a default under the Sublease.

43. Atlantis operates most of the service stations subject to the Sublease and the Distributor Agreement indirectly.

Atlantis subleases these stations to individual retail operators who manage the service stations.

44. However, while the retail operators manage the service stations, Atlantis retains ownership of the fuel sold thereat.  Atlantis is entitled to the revenues from the sale of the fuel, and pays the retail operators a commission on fuel sold equal to a specified dollar amount per gallon sold.

45. In addition, Atlantis retains control of the credit card equipment and system and receives all payments made through them.  Atlantis remits the commission portion of credit card payments back to the retail operators.

**D.     Atlantis's Forbearance Agreement With GPMI**

46. In approximately August 2008, Atlantis entered into an agreement with GPMI to acquire four million gallons of diesel fuel in bulk at a specified price for resale at the service stations.

47. Atlantis was able to sell approximately one million gallons of this diesel fuel at a price that allowed Atlantis to realize a reasonable profit.

48. However, before Atlantis could sell the balance of the diesel fuel, the market price of diesel fuel suffered a severe drop over a period of several days.

49. This price movement was not typical.  Industry experts have stated the diesel fuel market has never acted in this manner on any other occasion.

50. Ultimately, Atlantis suffered a loss of approximately $1.50 per gallon on the sale of the remaining three million gallons of diesel fuel.

51. Atlantis absorbed this approximately $4.5 million loss through cashflow and an increase in its payable balance with GPMI.

52. On January 7, 2009, Atlantis and GPMI entered into a Forbearance Agreement (the "Forbearance Agreement") and other associated agreements.

53. As of January 7, 2009, owed GPMI $6,372,384.49, of which $4,103,009.70 (the "Outstanding Balance") was purportedly overdue.

54. GPMI claimed that Atlantis was in default of the Distributor Agreement as a result of this outstanding amount.

55. Prior to January 7, 2009, GPMI sent Atlantis a Notice of Termination of the Distributor Agreement asserting a right to terminate the Distributor Agreement at the expiration of thirty days.

56. Pursuant to and subject to the terms of the Forbearance Agreement, GPMI agreed to forbear temporarily

from enforcing its claimed rights under, *inter alia*, the

Distributor Agreement and the Notice of Termination.

57. In the Forbearance Agreement, Atlantis agreed,

among other things, to enter into a Cash Management

Agreement with GPMI, grant GPMI mortgages on all of its real

estate, assign to GPMI all of its agreements with individual

retail operators of service stations, and pay currently for all

Products delivered by GPMI.

58. In the Cash Management Agreement, Atlantis

agreed to deposit all revenues it received in a deposit account

in the name of GPMI as secured creditor of Atlantis and under

the sole dominion and control of GPMI.

59. The Cash Management Agreement also provided

that GPMI would withdraw the money from this account each

day and use it to make the following payments in order of

priority:  (1) to Getty on account of current Products supplied;

(2) on account of leases and real estate taxes for service

stations GPMI leases to Atlantis; (3) in GPMI's sole discretion

for ordinary and necessary expenses of supplying Products to

the service stations; (4) on account of the Outstanding Balance;

and (5) to replace the security required by GPMI for future

shipments under the Distributor Agreement.

60. The Forbearance Agreement provided that it would extend until all amounts due were paid in full.

61. After the parties executed the Forbearance Agreement – from November 2008 through March 2010 – GPMI insisted that Atlantis allow an outside consultant, a local accounting firm, to oversee Atlantis's cashflow. The GPMI representatives present at Atlantis's offices were Rob Riley, with oversight by Dave Wallace, who reported directly to Logovinsky.

62. GPMI's agents and accountants were present at Atlantis's office five days a week for seventeen months and oversaw all cash transactions associated with GPMI, including accounts receivable and payable, banking, pricing, and payment and check approval.

63. As a result of its agents and accounts' work, GPMI was aware that the outstanding balance Atlantis owed to GPMI could only be paid off through a refinancing transaction, a sale of assets, or the acquisition by Atlantis of new revenue-generating business.

**E.      GPMI and Lukoil's Promise To Transfer Service Stations to Atlantis and Atlantis's Refinancing**

64. In late 2009, Bancorp Bank ("Bancorp") – Atlantis's existing lender at the time – approached Atlantis with regard to four service stations whose owner/operator was

in debt to Bancorp.  Specifically, Bancorp proposed that
Atlantis take ownership of the sites and assume the
corresponding debt.

65. Bancorp had concluded that the existing owner of
these sites could not operate these stations in a manner
sufficient to pay the debt owed to Bancorp.

66. Atlantis reviewed the sites and determined that it
was unable to take over the sites and incur additional debt
without a corresponding increase in income.

67. On or about November 17, 2009, GPMI sold 164
service stations properties and contracts to supply an additional
approximately 339 other service stations to Lukoil Americas.
As a result of this transfer, GPMI no longer owned any assets
unrelated to the service stations it leased from Getty Realty.

68. In particular, 58 of the sites GPMI transferred to
Lukoil Americas are located in Pennsylvania.

69. Atlantis was aware that these 58 service stations
could provide the additional revenue that Atlantis would need
to service the debt from the four sites Bancorp has asked it to
assume.

70. Accordingly, Atlantis approached Bancorp to seek
its support and assistance in acquiring the 48 service stations.

71. After Bancorp agree to assist Atlantis in the acquisition of the 58 sites, Atlantis approached Vince DeLaurentis, a senior officer of both GPMI and Lukoil Americas, about the acquisition.

72. Specifically, Ken Morrison, the president of Atlantis, proposed to DeLaurentis that the purchase would benefit both parties as it would enable Atlantis to pay off the remaining outstanding payable balance Atlantis owed to GPMI.

73. DeLaurentis advised Morrison that Logovinsky had the final authority concerning any such acquisition.

74. Logovinsky advised DeLaurentis that Lukoil Americas would not sell the 58 sites to Atlantis, but rather that Logovinsky had investors who would purchase the sites and enter into an agreement with Atlantis for Atlantis to supply them.

75. Morrison told Logovinsky that, in order for such a transaction to work, Atlantis would need a gross margin of $.03 per gallon.

76. Logovinsky agreed with Morrison's evaluation of the transaction.

77. Due to the existing Forbearance Agreement, however, Logovinsky indicated that Lukoil Americas would only enter into the transaction for the transfer of the 58 service

stations to Atlantis if Atlantis paid outstanding payable balance owed to GPMI before entering into the transaction.

78. On numerous occasions thereafter, Logovinsky asked Morrison how Atlantis was going to pay down the payable.

79. Once Logovinsky advised Morrison that Atlantis would need to pay off the outstanding payable before the 58 service stations could be transferred to Atlantis, Morrison approached Bancorp to seek assistance in completing the transaction.

80. Bancorp performed its own analysis of the proposed transfer of the 58 service stations and agreed to finance the payment of the amount Logovinsky indicated had to be paid to GPMI to reduce the outstanding payable before the transfer of the 58 service stations could occur.

81. Specifically, in discussions between Atlantis and Bancorp, the parties reviewed how the additional $.03 per gallon in revenue could be used to pay the debt on Bancorp's advance of the funds to pay the payable to GPMI.

82. In early February 2010, Morrison arranged a meeting between himself, Logovinsky and DeLaurentis to discuss the proposed transactions.

83. During this meeting, Logovinsky indicated that he doubted that Bancorp would in fact close on the refinancing transaction and fund the payment of the outstanding amount to GPMI.

84. Nevertheless, Logovinsky, for himself, GPMI and Lukoil Americas, promised Morrison that the 58 service stations would be transferred to Atlantis if the Bancorp financing occurred and the balance paid to GPMI.

**F.     The February 26, 2010 Meeting Between GPMI, Lukoil Americas, Atlantis and Bancorp**

85. Morrison arranged a meeting between representatives of GPMI and Lukoil Americas, on one hand, and Bancorp, on the other.

86. Specifically, Morrison called DeLaurentis by telephone to see if he could participate in a meeting with Bancorp.

87. Morrison explained to DeLaurentis that neither Bancorp nor Logovinsky, on behalf of GPMI and Lukoil Americas, would move forward without the other side committing to do the same.

88. In other words, Bancorp would not move forward with the refinancing transaction unless Logovinsky, GPMI and Lukoil Americas committed to proceed with the transfer of the 58 service stations to Atlantis.  Logovinsky, conversely, had

indicated that he, GPMI and Lukoil Americas would not move forward with the transfer of the 58 service stations unless Bancorp assured it that it would close on the refinancing.

89. During this telephone conversation, DeLaurentis indicated he would participate in this meeting in order to satisfy both sides' requirements.

90. On February 26, 2010, a meeting took place at Bancorp's offices at 1818 Market Street in Philadelphia, Pennsylvania.

91. This meeting began at 10:00 am Eastern time and lasted for one hour.

92. Ken Morrison attended the meeting on behalf of Atlantis.

93. Arthur Birenbaum, Michael Schrieber and Kevin Boyer attended the meeting on behalf of Bankcorp.

94. Logovinsky and Delaurentis attended the meeting on behalf of GPMI and Lukoil Americas.

95. Both Logovinsky and DeLaruentis were senior officers of both GPMI and Lukoil Americas with full authority to speak on behalf of each company.

96. At the time of the meeting on February 26, 2010, DeLaurentis was a member of the board of directors of Lukoil Americas.

97. The meeting was held with the express purpose of discussing the status of Atlantis's efforts to refinance and Lukoil Americas's transfer of the 58 service stations to Atlantis.

98. During the meeting, Logovinsky requested evidence of Bancorp's commitment to finance Atlantis.  Bancorp provided such evidence.

99. At the same time, Logovinsky and Delaurentis promised, represented to and assured the representatives of Atlantis and Bancorp then present that the transfer of the 58 service stations from Lukoil Americas to Atlantis would take place concurrently with or shortly after the closing of the refinancing.

100.	Specifically, Delaurentis represented to and assured all of those present, and Logovinsky confirmed and concurred in those representations and assurances, that: (a) Logovinsky and DeLaurentis had complete authority to proceed with the transfer of the 58 service stations to Atlantis; (b) the board of directors of Lukoil Americas had fully approved the proposed transaction; (c) the only condition on the transfer of the 58 service stations was the completion of the Bancorp refinancing and the consequent payment on GPMI's outstanding balance; (d) Logovinsky, as part of an investor

group, would purchase the stations from Lukoil America; (e) Atlantis would obtain a lease of these stations from the investor group; (f) Atlantis would be able to obtain a distributor franchise agreement from GPMI, pursuant to which it would be able to obtain fuel for resale and license for the use of trademarks and associated intellectual property at these service stations; (g) this transaction would be completed within 90 days; (h) Logovinsky fully intended to go through with this transaction; and (i) if Atlantis made the initial payment on the outstanding balance funded by Bancorp, GPMI would agree to accept payment of the remaining balance only after, and only out of the excess revenues resulting from, the transfer of the 58 service stations to Atlantis.

101.    Upon information and belief, none of these statements was true at the time they were made,

102.    Bancorp did not require confirmation of these representations and assurances in writing, because Logovinsky and Delaurentis had traveled to Philadelphia to meet with Bancorp and Atlantis personally and offered their assurances that the transfer would occur.

103.    In addition, Bancorp was familiar with Delaurentis, an experienced and trusted participant in the

petroleum marketing industry and a former senior executive at Sun Oil Company in Philadelphia.

104.     The fact that Delaurentis, a senior member of the industry, traveled to Philadelphia from Long Island, New York for a meeting with the lender to GPMI's franchisee, at which representations and assurances were provided concerning the transfer of the 58 service stations, provided additional weight and reason to trust and rely on those representations and assurances.

**F.     GPMI's and Lukoil Americas's Further Representations and Discussions Concerning the 58 Service Stations**

105.     In reliance on these representations and assurances, Bancorp and Atlantis proceeded to prepare paperwork to document the refinancing deal.

106.     Specifically, based on the representatives and assurances provided by Logovinsky, DeLaurentis, GPMI and Lukoil Americas at the meeting on February 26, 2010, Bancorp agreed to fund a $4.5 million payment to GPMI on its outstanding debt as part of the refinancing transaction.

107.     During the time the refinancing paperwork was being drafted, Atlantis continued discussions with Lukoil Americas, GPMI and Logovinsky about the transfer of the 58 service stations.

108.    On or about March 10, 2010, Atlantis prepared draft documents memorializing the transfer of the 58 service stations.

109.    Specifically, Atlantis prepared: (a) a draft PMPA Distributor Franchise Agreement between GPMI and Atlantis; and (b) a draft Lease and Agreement between an unspecified Investor Group and Atlantis.

110.    These draft documents were based on forms that had been negotiated between Atlantis and GPMI in connection with a prior similar transfer that was not completed.

111.    The draft PMPA Distributor Franchise Agreement generally: (i) provided for the sale by GPMI and purchase by Atlantis of Products to be sold at the 58 service stations; and (ii) granted Atlantis a non-exclusive license to use certain trademarks and similar intellectual property in connection with the operations of the 58 service stations.

112.    The draft Lease and Agreement generally provided that Logovinsky's investor group would lease the 58 service station premises to Atlantis, subject to a covenant by Atlantis that fuel would be sold only under the Getty or Lukoil brands at these premises.

113.     Atlantis provided these documents to Bancorp on March 18, 2010, as a part of Bancorp's \underwriting process for the refinancing transaction.

114.     Logovinsky was aware that Bancorp received these documents as part of its underwriting process.

115.     At or about the same time, Atlantis sent copies of the documents by electronic mail to GPMI.

116.     During the period from February 26, 2010, and March 29, 2010, there were constant communications between Atlantis and GPMI and Lukoil Americas concerning the transfer of the 58 service stations.

117.     During this period, Logovinsky, GPMI and Lukoil Americas continued to represent and provide assurances, in person, by telephone and by electronic mail, that the transfer of the 58 service stations would occur after the Bancorp refinancing closed and GPMI was paid $4.5 million.

118.     For instance, GPMI reiterated that, if Atlantis made the agreed payment to resolve the Forbearance Agreement, then, in conjunction with the transfer of the 58 service stations, GPMI would accept payment of the remaining outstanding balance under the Distributor Agreement over a lengthy period of time out of the excess cash flow from the operation of the 58 service stations.

22

119.     In addition, during February and March 2010, GPMI and Lukoil Americas provided Atlantis substantial information about the operations of the 58 service stations in order to assist Atlantis, as well as Bancorp, in their ongoing evaluation of the transaction and the closing of the refinancing.

120.     If Lukoil Americas had transferred operation of the 58 service stations to Atlantis, Atlantis would have received sufficient excess cash flow that it could have paid the remaining balance due to GPMI as of April 1, 2010, in full over time.

**G.     The Closing on the Bancorp Refinancing and Payment to GPMI**

121.     Bancorp and Atlantis closed on the refinancing transaction on April 1, 2010.

122.     The closing involved the execution of loan documents and associated agreements concerning four property loans, a working capital line of credit, and a corporate term loan.  Specifically, the refinancing included the following credit facilities, totaling $20.8 million:

123.     Bancorp extended to Atlantis a $7.8 million line of credit, bearing interest at the rate of 4.0%.  The line of credit included a $3.0 million letter of credit facility.

124.     Atlantis also received from Bancorp an $8 million corporate loan to be used to acquire the four properties

Bancorp had originally identified.  This loan bore interest at a rate of 4.5%.

125.     In addition, the refinancing included a $5 million corporate loan, with interest accruing at the rate of 4.5%.  This loan was to be used to pay the Outstanding Balance to GPMI.

126.     As security for these credit facilities, Atlantis granted Bancorp: (a) a mortgage on the four properties; and (b) a lien on all personal property of Atlantis.

127.     Bancorp completed the closing on the refinancing transaction as a result of and in reliance on the representations and assurances provided by Logovinsky, DeLaurentis, Lukoil Americas, and GPMI concerning the transfer of the 58 service stations, including, without limitation, that: (a) Lukoil Americas's board of directors had approved the transaction; (b) Logovinsky, Lukoil Americas and GPMI intended to complete the transfer of the 58 service station; and (c) GPMI would accept payment of the remaining outstanding payable balance (after payment of $4.5 million at the closing of the refinancing) over time and only out of the excess cash revenue derived from the 58 service stations.

128.     As part of the refinancing transaction, GPMI received substantial repayment of the amounts it was owed and security for future payments.

129.     Specifically, on April 6, 2010, Atlantis paid GPMI by wire transfer $4,500,000.

130.     After Atlantis made this $4.5 million payment to GPMI, the outstanding balance due to GPMI under the Distributor Agreement was $5,850,972.

131.     In addition, Atlantis provided GPMI a $1,000,000 letter of credit as security for its obligations under the Distributor Agreement.

132.     Upon receipt of the payment and letter of credit, among other things: the Forbearance Agreement, Cash Management Agreement and related agreements were terminated; GPMI returned to Atlantis a note given in conjunction with the Forbearance Agreement; and GPMI satisfied the mortgages Atlantis had given in connection with the Forbearance Agreement.  A copy of GPMI's letter reflecting these actions is attached hereto as Exhibit D.

133.     Moreover, GPMI acknowledged and agreed that, upon completion of the payment and issuance of the letter of credit, Atlantis was not in default under the Distributor

Agreement and the Distributor Agreement was in full force and effect.

134.     As part of this transaction, GPMI agreed to specific credit requirements for the supply of motor fuel under the Distributor Agreement to Atlantis in the future.

135.     These credit terms included that: (a) Atlantis would provide a $1 million letter of credit to secure motor fuel purchases; (b) Atlantis would have a credit limit of $6 million, without regard to the timing of payment in relation to invoice dates; (c) Atlantis could pay GPMI through wire transfers, rather than GPMI having the right to debit Atlantis's accounts; and (d) GPMI acknowledged that it had an obligation to supply Atlantis motor fuel pursuant to the Distributor Agreement.

**H.     GPMI's and Lukoil Americas's Failure to Effectuate the Transfer of the 58 Service Stations**

136.     After the closing of the refinancing transaction, Atlantis contacted Logovinsky on numerous occasions to finalize the transfer of the 58 service stations.

137.     Between April 1, 2010 and June 30, 2010, Logovinsky continued to assure Atlantis that the transfer of the 58 service stations would occur.

138.     On July 8, 2010, Arthur Birenbaum on behalf of Bancorp sent a letter to Logovinsky inquiring about

the status of the as-yet-uncompleted transfer of the 58 service stations.

139.     On August 17, 2010, Logovinsky replied in writing to Birenbaum and Atlantis that completion of the transfer of the 58 service stations was contingent on his investor group funding the amount necessary to complete the transaction.

140.     Logovinsky had never previously indicated that the completion of the transfer of the 58 service stations was contingent on any investor group providing funding not already committed.

141.     To the contrary, Logovinsky had previously represented to and assured Atlantis and Bancorp that the transaction would be completed.

142.     In response to Logovinsky's letter, Morrison wrote to Logovinsky on August 30, 2010, concerning the transfer of the 58 service stations.

143.     In his August 30 letter, Morrison stated that Atlantis was prepared to proceed immediately on the transfer of the 58 service stations.

144.     In addition, Morrison indicated that, if Logovinsky's investor group could not fund the transaction,

Atlantis was prepared itself to move purchase the 58 locations for $50MM directly from Lukoil Americas.

145.     Logovinsky responded to this letter by stating that the board of directors of Lukoil Americas had never approved the transfer of the 58 service stations and, thus, the transaction could not be completed.

146.     Upon information and belief, in the fall of 2010, Lukoil Americas began to market its ownership interest in GPMI for sale to a third party.

147.     Upon completion of the sale of Lukoil Americas's ownership interest in GPMI, the only remaining assets of Lukoil Americas would be certain motor-fuel distribution assets unrelated to Getty Realty that GPMI had previously transferred to Lukoil Americas.

148.     These remaining assets included the 58 service stations that Logovinsky had promised and represented would be transferred to Atlantis.

149.     In the absence of the transfer of the 58 service stations to Atlantis, Lukoil Americas continues to operate these stations through its own employees and officers, including Logovinsky and DeLaurentis.

150.     As a result of the proposed sale of its ownership interests of GPMI to a third party, Lukoil Americas

had few remaining assets – other than the 58 service stations – that it required employees and officers, such as Logovinsky and DeLaurentis, to operate.

**I.      GPMI's Purported Termination of the Franchises**

151.     On February 17, 2011, at 4:00 p.m. Eastern time, Logovinsky contacted Morrison on his cellular telephone.

152.     During the call, Logovinsky told Morrison that GPMI would stop supplying motor fuel to Atlantis effective midnight that night.

153.     Logovinsky informed Morrison that Atlantis would therefore need to find a different supplied for motor fuel.

154.     In addition, Logovinsky advised Morrison that GPMI would no longer allow Atlantis to use GPMI's system and accounts for processing credit card payments.

155.     Rather, Logovinsky told Morrison that Atlantis would have to arrange for a different bank to process its credit card transactions, open new accounts for such processing, and reprogram the credit card equipment to accommodate those changes.

156.     During this telephone call, Logovinsky did not provide Morrison any reason or ground for GPMI's decision and demands of Atlantis.

157.     Nor did Logovinsky afterward provide any reason or ground for GPMI's actions.

158.     GPMI has never provided Atlantis written notice, whether sent by hand delivery, certified mail or otherwise, concerning any purported termination of the Distributor Agreement or Credit Card Agreement as of February 18, 2011.

159.     As of February 17, 2011, the outstanding balance due to GPMI under the Distributor Agreement was approximately $6 million.

160.     Atlantis was forced to undertake extraordinary efforts to locate an alternative supplier of fuel as a result of GPMI's actions.

161.     Through the expenditure of substantial effort by Atlantis's employees, and at a substantial cost to Atlantis, Atlantis obtained an alternative supplied of fuel without disrupting sales at its service stations within a few days.

162.     Bancorp had to be involved in these discussions as well, because all new suppliers required some sort of credit assurance from Bancorp.

163.     In addition, in order to reprogram the credit card equipment, as required by GPMI's actions, Atlantis had to

send agents to each individual service station to reprogram each piece of equipment.

164.    Because of the minimal notice GPMI provided concerning its abandonment of the Credit Card Agreement, it took several days for GPMI to make alternative arrangements and set up new accounts for credit card transaction processing.

165.    As a result, GPMI was able to seize improperly approximately $1.2 million from the proceeds of credit card transactions.

166.    GPMI improperly applied these credit card proceeds to the amounts it was owed.

167.    Atlantis suffered substantial damages as a result of GPMI's actions on or about February 17, 2011.

168.    GPMI's actions resulted in product outages at some of the service stations subject to the Sublease.  As a result, Atlantis lost motor fuel sales.

169.    In addition, Atlantis suffered damages as a result of GPMI's improper seizure o approximately $1.2 million from Atlantis's credit-card-transaction processing accounts.

170.    On February 28, 2011, Lukoil Americas transferred its interest in GPMI to Cambridge Petroleum Holding, Inc. ("Cambridge")

171.    Bjorn Q. Aaserod is the principal of Cambridge.

172.    Shortly after March 1, 2011, Aaserod contacted Atlantis concerning the Sublease.

173.    At that time, Aaserod indicated that it wanted to take over direct control of the service stations subject to the Sub \ease.

174.    Specifically, Aaserod stated that, if Atlantis would agree to termination of the Sublease, GPMI would forgive any outstanding balance under the Distributor Agreement.

175.    Atlantis rejected this proposal.

176.    On March 25, 2011, GPMI sent a letter (the "March 25 Letter") to Atlantis by electronic mail and certified mail purporting to terminate the Sublease.  A true and correct copy of the March 25 Letter is attached hereto as Exhibit E.

177.    In the March 25 Letter, GPMI asserted that: "Tenant has defaulted under the Distributor Agreement by failing to make payments when due to Landlord for the sale of Products."

32

178.     GPMI further claimed that "Tenant's default under the Distributor Agreement constitutes a material breach and cross-default pursuant to Section 32 of the Sublease."

179.     GPMI therefore asserted that it had terminated the Sublease effective April 25, 2011.

180.     GPMI enclosed with the March 25 Letter a copy of the required Summary of Title I of the Petroleum Marketing Practices Act.

181.     On April 11, 2011, GPMI sent a letter (the "April 11 Letter") to Atlantis by electronic mail and hand delivery purporting to terminate the Sublease and Distributor Agreement.  A true and correct copy of the March 25 Letter is attached hereto as Exhibit F.

182.     The April 11 Letter was hand delivered to Atlantis at 11:35 a.m.

183.     GPMI did not send a copy of the April 11 Letter to Atlantis by electronic mail until 1:45 pm on April 11, 2011.

184.     In the April 11 Letter, GPMI asserted that Atlantis had defaulted under the Distributor Agreement, Sublease and Credit Card Agreement by "continuously failing to make timely payments when due to [GPMI] for the sale of

Products" and "failing to provide 30 days written notice to Landlord prior to terminating the Credit Card Agreement."

185.     GPMI further contended in the April 11 Letter that the Distributor Agreement, Sublease and Credit Card Agreement were terminated effective noon on that day, without opportunity to cure any default.

186.     In the April 11 Letter, GPMI also demanded that Atlantis quit and surrender the service stations subject to the Sublease on or before April 13, 2011.

187.     At present, the outstanding balance due to GPMI under the Distributor Agreement is  $5,839,753.17.

188.     Notwithstanding the March 25 Letter and April 11 Letter, Atlantis has at all relevant times paid all amounts due under the Sublease in a timely manner.

## CAUSES OF ACTION

### COUNT I
### (PETROLEUM MARKETING
### PRACTICES ACT: DAMAGES)

189.     Each of the preceding paragraphs is incorporated herein by reference.

190.     The Sublease and the Distributor Agreement are franchises as that term is defined in section 2801(1) of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*

191.     GPMI, as franchisor, has purported to terminate the Sublease and Distributor Agreement.

192.     GPMI did not terminate the Sublease and Distributor on any of the grounds described in section 2802 (b)(2) of the PMPA, 15 U.S.C. § 2802(b)(2).

193.     In purporting to terminate the Sublease and Distributor Agreement, GPMI did not meet the notification requirements of section 2804 of the PMPA, 15 U.S.C. § 2804.

194.     Accordingly, GPMI has failed to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802.

195.     As set forth above, Atlantis has suffered actual damages as a proximate result of GPMI's failure to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802.

196.     GPMI's failure to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802, was in willful disregard of the requirements of that section and the rights of Atlantis thereunder.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendant Getty Petroleum Marketing, Inc. for actual damages, exemplary damages, reasonable attorney and expert witness fees, interest, and such other relief as the Court deems just.

## COUNT II
## (PETROLEUM MARKETING PRACTICES ACT:
## EQUITABLE RELIEF)

197.     Each of the preceding paragraphs is incorporated herein by reference.

198.     Under section 2805(b)(1) of the PMPA, 15 U.S.C. § 2805(b)(1), a district court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

199.     Under section 2805(b)(2) of the PMPA, 15 U.S.C. § 2805(b)(2), a district court shall grant a preliminary injunction to remedy the effects of a failure to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802, if: (A) the franchisee shows that the franchise of which he is a party has been terminated and there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

200.     As set forth above, GPMI has purported to terminate the Sublease and the Distributor Agreement and, in doing so, failed to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802.

201.     There exist sufficiently serious questions going to the merits of whether GPMI failed to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802, to make such questions a fair ground for litigation.

202.     If Atlantis does not receive preliminary injunctive relief and the Sublease and Distributor Agreement are terminated, Atlantis's business will be destroyed.

203.     By contrast, if preliminary relief is granted preventing the termination of the Sublease and Distributor Agreement, GPMI will receive the benefits of its bargain, as Atlantis will continue to pay rent under the Sublease Agreement.

204.     Accordingly, preliminary injunctive and other equitable relief are appropriate to prevent the termination of the Sublease and Distributor Agreement and remedy GPMI's failure to comply with the requirements of section 2802 of the PMPA, 15 U.S.C. § 2802.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendant Getty Petroleum Marketing, Inc.: granting a temporary restraining

order and preliminary and permanent injunctions: (a) barring GPMI from terminating the

Sublease and the Distributor Agreement; (b) prohibiting GPMI from interfering with Atlantis's

operation and quiet enjoyment of the premises subject to the Sublease and use of the trademarks

and other intellectual property licensed to it pursuant to the Distributor Agreement; and (c)

requiring GPMI to supply fuel to Atlantis in accordance with the Distributor Agreement;

awarding Atlantis reasonable attorney and expert witness fees; and granting such other relief as

the Court deems just.

## COUNT III
## (FRAUD)

205.      Each of the preceding paragraphs is

incorporated herein by reference.

206.      As set forth above, Semyon Logovinsky and

other authorized representatives of GPMI and Lukoil Americas

promised, represented to and assured the representatives of

Atlantis and Bancorp that, *inter alia,* Lukoil Americas would

cause 58 service stations to be transferred from Lukoil

Americas to an investor group controlled by Logovinsky, and

the investor group would lease the service stations to Atlantis,

if Atlantis refinanced its debt with Bancorp and paid down

outstanding amounts owed to GPMI under the Distributor

Agreement, the board of directors of Lukoil Americas had

approved these transactions, and Logovinsky had full authority

to complete them.  This transfer was to occur immediately

upon Atlantis's closing the refinancing transaction with Bancorp and paying down its debt owed to GPMI.

207.     The GPMI and Lukoil Americas representatives further promised and represented that, as part of this transaction, Atlantis would obtain a distributor franchise agreement from GPMI, pursuant to which Atlantis would be able to obtain motor fuel for resale and a license for the use of trademarks and associated intellectual property at these service stations.

208.     Upon information and belief, the representations made by the GPMI and Lukoil Americas representatives were false when made.

209.     The representations made by the GPMI and Lukoil Americas representatives were material to Atlantis's decision to consummate the refinancing transaction with Bancorp and make multimillion dollar payments to GPMI.

210.     Upon information and belief, the representatives knew when they made these statements, or recklessly disregarded the fact, that: Lukoil Americas would not transfer the service stations to Atlantis, GPMI would not enter into a franchise agreement with Atlantis to supply those stations with fuel or license the use of trademarks and associated intellectual property, the board of directors of

Lukoil Americas had not approved these transactions, and Logovinsky did not have full authority to complete them.

211.    Upon information and belief, the GPMI and Lukoil representatives made these false statements and assurances regarding the service stations and related distributor franchise agreement with the intent to mislead Atlantis and Bancorp into relying on these statements and assurances in deciding to proceed with the refinancing transaction and subsequent payment to GPMI.

212.    Atlantis and Bancorp justifiably relied on these statements and assurances in closing the refinancing transaction with Bancorp and subsequently making a multimillion dollar payment and providing letters of credit to GPMI.

213.    Atlantis's justifiable reliance on these statements and assurances was the proximate cause of injuries suffered by Atlantis, including without limitation: costs incurred in closing the refinancing transaction with Bancorp, interest paid on credit facilities issued by Bancorp, $4,500,000 in payments made to GPMI, and the cost of obtaining an independent supply of fuel when GPMI terminated the Distributor Agreement and stopped providing Atlantis with fuel in February 2011.

214.     In addition, the conduct by GPMI and Lukoil Americas listed above and recounted through this Complaint was outrageous, intentional, and malicious as well as recklessly indifferent to the requirements of law and the rights of Atlantis thereunder.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendants Getty Petroleum Marketing, Inc., Lukoil Americas Corp. and Semyon Logovinsky, for compensatory damages, punitive damages, interest, and such other relief as the Court deems just.

## COUNT VII
### (CIVIL CONSPIRACY)

215.     Each of the preceding paragraphs is incorporated herein by reference.

216.     GPMI, Lukoil Americas and Logovinsky combined with a common purpose to do an unlawful act by unlawful means and for an unlawful purpose.

217.     Each of GPMI, Lukoil Americas and Logovinsky performed an overt act in furtherance of that common purpose.

218.     The aforementioned combination and the acts performed thereby were the proximate cause of injuries suffered by Atlantis, including without limitation: costs incurred in closing the refinancing transaction with Bancorp, interest paid on credit facilities issued by Bancorp, $4,500,000

in payments made to GPMI, and the cost of obtaining an independent supply of fuel when GPMI terminated the Distributor Agreement and stopped providing Atlantis with fuel in February 2011.

219.    In addition, the conduct by GPMI and Lukoil Americas listed above and recounted through this Complaint was outrageous, intentional, and malicious as well as recklessly indifferent to the requirements of law and the rights of Atlantis thereunder.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendants Lukoil Americas Corp. and Getty Petroleum Marketing, Inc. for compensatory damages, punitive damages, interest, and such other relief as the Court deems just.

**COUNT VIII**
**(BREACH OF CONTRACT)**

220.    Each of the preceding paragraphs is incorporated herein by reference.

221.    As set forth above, GPMI entered into several franchise agreements with Atlantis, including the Distributor Agreement and the Sublease.

222.     GPMI entered into a Forbearance Agreement with Atlantis in February 2009 whereby GPMI promised to forbear from enforcing its rights under the Distributor Agreement in consideration of Atlantis's promise to, *inter alia*, enter into a Cash Management Agreement with

GPMI, grant GPMI mortgages on all of its real estate, assign to GPMI all of its agreements with individual retail operators of service stations, and pay currently for all Products delivered by GPMI.

223.     No later than March 2010, GPMI, Lukoil Americas and Logovinsky entered into agreements with Atlantis whereby Atlantis promised to complete the refinancing transaction with Bancorp and make a $4.5 million payment to GPMI in consideration of GPMI's, Lukoil Americas' and Logovinsky's promise to cause 58 service stations then owned by Lukoil Americas to be leased to Atlantis and to provide Atlantis fuel for resale and a license for the use of trademarks and associated intellectual property at these service stations.

224.     By failing to cause the 58 service stations to be transferred to Atlantis and by failing to provide Atlantis fuel for resale and a license for the use of trademarks and associated intellectual property at these service stations, GPMI, Lukoil Americas and Logovinsky committed a material breach of the 2010 agreement.

225.     By terminating the Distributor Agreement and the Sublease, GPMI committed a material breach of the Distributor Agreement, the Sublease and the 2010 agreements.

226.     As a proximate result of these material breaches, Atlantis continues to suffer damages as set forth above.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendants Getty Petroleum Marketing, Inc., Lukoil Americas Corp. and Semyon Logovinsky for compensatory damages, consequential damages, interest, and such other relief as the Court deems just.

### COUNT IX (IN THE ALTERNATIVE)
### (PROMISSORY ESTOPPEL)

227.     Each of the preceding paragraphs is incorporated herein by reference.

228.     As set forth above, Logovinsky and other GPMI and Lukoil Americas representatives promised and represented to Atlantis that they would cause the 58 additional service stations to be leased to Atlantis and that they would provide Atlantis fuel for resale and a license for the use of trademarks and associated intellectual property at these service stations.

229.     Atlantis reasonably and justifiably relied on these promises and representations in closing the refinancing transaction with Bancorp and making payments and providing letters of credit to GPMI following the transaction.

230.     Based on the foregoing, GPMI, Lukoil Americas and Logovinsky are estopped from denying their

obligation to transfer the 58 additional service stations to Atlantis and provide Atlantis fuel for resale and a license for the use of trademarks and associated intellectual property at these service stations.

231.    By virtue of GPMI's, Lukoil Americas's and Logovinsky's failure and refusal to abide by their promises, Atlantis has suffered and continues to suffer damages as set forth above.

WHEREFORE, Plaintiff Atlantis Petroleum, LLC demands the entry of judgment in its favor and against Defendants Getty Petroleum Marketing, Inc., Lukoil Americas Corp. and Semyon Logovinsky for compensatory damages, interest, and such other relief as the Court deems just.


HANGLEY ARONCHICK SEGAL & PUDLIN


By:____/S/ James M. Matour_____
    William T. Hangley
    James M. Matour #32209
    Matthew A. Hamermesh
    Robert A. Wiygul
    One Logan Square, 27th Floor
    Philadelphia, Pennsylvania 19103-6933
    (215) 568-6200 (telephone)
    (215) 568-0300 (facsimile)

Dated: April 12, 2011            *Counsel for Plaintiff Atlantis Petroleum, LLC*