

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ATLANTIS PETROLEUM, LLC
:
: CIVIL ACTION
v. :
**FILED** NO. 11-2517
GETTY PETROLEUM MARKETING,
INC., ET AL.                        SEP 1 6 2011
                              MICHAEL E. KUNZ, Clerk
                              By___ IC___ Dep. Clerk
SURRICK, J.                                    SEPTEMBER 15, 2011

MEMORANDUM

Presently before the Court is Getty Petroleum Marketing, Inc.'s Motion for Summary

Judgment or, in the Alternative, for Partial Summary Judgment on Plaintiff Atlantis Petroleum,

LLC's Second Amended Complaint and Getty's Counterclaims. (ECF No. 74.) For the following

reasons, the Motion will be granted in part and denied in part.

## I.     BACKGROUND

Plaintiff Atlantis Petroleum, LLC, is a gasoline distributor that provides fuel to gasoline

dealers throughout the Northeast and Mid-Atlantic United States. Plaintiff also manages and

provides marketing expertise to service stations. In 2006, Plaintiff took over the operation of 75

of Defendant Getty Petroleum Marketing, Inc.'s service stations in Pennsylvania pursuant to a

series of agreements, including a PMPA Distributor Agreement (Distributor Agreement), a

Distributor Credit Card and Equipment Lease Agreement (Credit Card Agreement), and a Site

and Facilities Sublease (Sublease). (Pl.'s Opp'n 8 & Wiygul Decl. Exs. 1-3, ECF No. 80 (filed

under seal).) Plaintiff operates three of the service stations itself and has subleased the remaining

72 stations to local dealers. Five of these subtenants purchase fuel from Plaintiff. The remaining

stations sell fuel owned by Plaintiff and collect a fixed commission on each gallon sold.

In August 2008, Plaintiff bought a large amount of diesel fuel from Defendant but was forced to resell the fuel at a substantial loss due to a sudden drop in the price of fuel. As a result, in early January 2009, Plaintiff's indebtedness to Defendant ballooned to $10,475,394.19. (Second Am. Compl. ¶ 45, ECF No. 58.) More than $4.1 million of the balance was overdue. (*Id.* at ¶ 46.) On January 6, 2009, Defendant informed Plaintiff that it was terminating the Distributor Agreement. Defendant advised Plaintiff that it was exercising its right to terminate because of Plaintiff's failure to pay off its debt. (Teslik Decl. Ex. 6, ECF No. 74 (filed under seal).) However, the next day Defendant and Plaintiff entered into a Forbearance Agreement and a Cash Management Agreement. (*Id.* Exs. 7, 8.) The Forbearance Agreement granted Defendant control over certain aspects of Plaintiff's operation. The Cash Management Agreement granted Defendant access to an account into which Plaintiff was required to deposit its revenues. Plaintiff acknowledged the existence of defaults under the Distributor Agreement for its failure to pay its outstanding balance, but Defendant agreed to a temporary forbearance of its right to terminate the franchise relationship.

Despite the protections contained in the Forbearance and Cash Management Agreements, Plaintiff continued to owe Defendant a significant amount of money. In early 2010, Plaintiff entered into a refinancing transaction with Bancorp Bank.[1] Bancorp provided Plaintiff with a total of $27.4 million in loans and credit, including a $5 million loan to pay down the balance that Plaintiff owed to Defendant. (*Id.* Ex. 9.) On April 6, 2010, Plaintiff and Defendant entered into an agreement pursuant to which Defendant would terminate the Forbearance Agreement and

---

[1] Bancorp was an intervenor plaintiff in this litigation, but has since stipulated to the dismissal of all of its claims. (ECF No. 72.)

2

Cash Management Agreement in return for a payment of $4.5 million from Plaintiff to Defendant to reduce the outstanding balance. (Wiygul Decl. Ex. 13.) After this payment was made, Plaintiff's outstanding balance was $5,850,972. (*Id.* Ex. 14.) Plaintiff also provided Defendant with a $1 million letter of credit.

Upon receipt of the payment and the letter of credit, Defendant acknowledged that the Distributor Agreement was "in full force and effect" and that Plaintiff was not in default on its obligations under the Distributor Agreement. (*Id.* Ex. 15.) Defendant also permitted Plaintiff to maintain a $6 million credit line with Defendant. (*Id.* Ex. 16.) In the months following the April refinancing agreement, Plaintiff's outstanding balance remained within several hundred thousand dollars of the $6 million credit limit. (*Id.* Ex. 24.) On November 29, 2010, the balance had reached $7,366,523. The next day it was reduced to $6,546,933. (*Id.*) On December 10, Defendant increased Plaintiff's approved lined of credit to $6.5 million. (Supp. Wiygul Decl. Ex. 3, ECF No. 94 (filed under seal).)

In December 2010 or January 2011, two of Defendant's executives, Semyon Logovinsky and Vincent DeLaurentis, informed Plaintiff's Chairman, Ken Morrison, that Defendant was undergoing some internal changes. (Wiygul Decl. Ex. 6 at 248:14-250:5.) As a result, the executives advised Morrison to begin looking for an alternative fuel supplier and credit card processor. (*Id.* at 249:3-6, 276:13-277:7.)

On February 17, 2011, Plaintiff's outstanding balance had increased to over $7.1 million. (Teslik Decl. Ex. 19.) That day, Logovinsky called Morrison and informed him that Defendant would no longer supply Plaintiff with fuel. (Wiygul Decl. Ex. 6 at 253:18-255:6.) Despite the fuel shutoff, Logovinsky told Morrison that Plaintiff should pay rent as usual because it would

3

continue to lease the stations from Defendant. Plaintiff was able to obtain an alternative fuel supplier within a few days. (*Id.* at 253:11-17.) Within a few weeks, Plaintiff reprogrammed its credit card processing equipment. This prevented Defendant from collecting credit card receipts to offset Plaintiff's outstanding balance. (Wallace Decl. ¶ 11, 13, ECF No. 74.)

In early March 2011, Plaintiff and Defendant entered into negotiations in an attempt to resolve the dispute. (Aaserod Decl. ¶ 14, ECF No. 74.) Plaintiff offered to pay a reduced amount if Defendant would forgive the remainder of Plaintiff's balance. (*Id.* at ¶ 15.) Defendant countered by offering to forgive Plaintiff of its entire debt—which was guaranteed by Plaintiff and Morrison personally—if Plaintiff would forfeit the Sublease and permit Defendant to retake control of the 75 service stations that are at the heart of this matter. (*Id.* at ¶ 19.) Plaintiff rejected this offer. (*Id.*)

On March 25, Defendant sent a letter to Plaintiff terminating the Distributor Agreement and the Sublease effective April 25. (Wiygul Decl. Ex. 19.) The letter stated that Plaintiff had defaulted on the Distributor Agreement by failing to make payments on its outstanding debt. The letter also stated that Plaintiff's default under the Distributor Agreement was a material breach and cross-default of the Sublease. Upon receipt of the letter, Morrison contacted Bjorn Aaserod, whose company had recently acquired Defendant. (*Id.* Ex. 6 at 312:22-313:20.) Morrison informed Aaserod that Plaintiff had retained a restructuring consultant. (*Id.* at 313:8-20; Aaserod Decl. ¶ 21.)

Following this conversation, Aaserod became concerned that Plaintiff was planning to file for bankruptcy. (Aaserod Decl. ¶ 21.) As a result, on April 11, 2011, Defendant sent a letter to Plaintiff terminating the Distributor Agreement, Sublease, and Credit Card Agreement

4

effective immediately. (Wiygul Decl. Ex. 20.)

The next day, Defendant filed suit against Plaintiff in the Southern District of New York seeking a preliminary injunction evicting Plaintiff from its service stations. *See Getty Petroleum Mktg., Inc. v. Atlantis Petroleum, LLC*, No. 11-2471, 2011 WL 1560908 (S.D.N.Y. Apr. 15, 2011). Plaintiff filed this action later the same day seeking a temporary restraining order and preliminary injunction prohibiting Defendant from taking any action to terminate Plaintiff's franchise. (ECF Nos. 1, 4.) After a hearing, we granted Plaintiff's motion for a temporary restraining order and enjoined the New York action. *Atlantis Petroleum, LLC v. Getty Petroleum Mktg., Inc.*, No. 11-2517, 2011 WL 1532378 (E.D. Pa. Apr. 19, 2011).

On June 24, 2011, Plaintiff filed a Second Amended Complaint against Getty Petroleum Marketing, Lukoil Americas Corporation, Lukoil North America, and Logovinsky. The Second Amended Complaint alleges violations of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.* (Counts I and II),[2] Fraud (Count III), Breach of Fiduciary Duty (Count IV), Civil Conspiracy (Count V), Breach of Contract (Count VI), and Promissory Estoppel (in the alternative) (Count VII).[3] At the request of counsel, we scheduled this matter for expedited trial. Defendant Getty now moves for summary judgment.

## II.  LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

---

[2] Count I seeks damages and Count II seeks equitable relief.

[3] On August 9, 2011, the parties submitted a Stipulation of Partial Dismissal, which dismissed Counts III-VII of the Second Amended Complaint. (ECF No. 72.) Moreover, Plaintiff settled all of its claims against the Lukoil entities and Logovinsky. Only Counts I and II, which allege violations of the PMPA against Defendant Getty, remain.

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citations omitted). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. ANALYSIS

Defendant seeks summary judgment on Plaintiff's PMPA claims and summary judgment on Defendant's counterclaims.

### A. Plaintiff's PMPA Claims

The PMPA regulates the relationship between petroleum franchisors and franchisees. Congress enacted the PMPA, in part, because "it was concerned that franchisors had been using

6

their superior bargaining power to compel compliance with certain marketing policies and to gain an unfair advantage in contract disputes." *Patel v. Sun Co.*, 141 F.3d 447, 451 (3d Cir. 1998) (citing S. Rep. No. 731, 95th Cong., 2d Sess. 17-19, *reprinted in* 1978 U.S.C.C.A.N. 873, 875-77 (Senate Report)). The purpose of this legislation is to provide "protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." *Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1055 (2d Cir. 1989) (quoting Senate Report at 874).

The PMPA accomplishes this goal by limiting the circumstances under which a franchisor may terminate a franchise. *See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 130 S. Ct. 1251, 1254 (2010). A "franchise" is defined as a contract that relates to any of the following three statutory elements: 1) the lease of the premises; 2) the license to use the franchisor's trademark; and 3) the agreement governing the supply of motor fuel. *See id.* at 1255 & n.1 (citing 28 U.S.C. § 2801(1)). A franchisor must comply with the substantive and procedural requirements of the PMPA to lawfully terminate a franchise relationship. 15 U.S.C. § 2802.

### 1. Grounds for Termination

Defendant relies on two statutory grounds for termination. First, termination is appropriate where there is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." *Id.* § 2802(b)(2)(A). Second, a franchisor may terminate upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable." *Id.* § 2802(b)(2)(C). A relevant "event" includes the "failure by the franchisee to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." *Id.* § 2802(c)(8). Courts have consistently held that the failure of a franchisee

7

to timely adhere to payment obligations is a proper ground for termination. *See, e.g.*, *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 377 (4th Cir. 1992); *Loomis v. Gulf Oil Corp.*, 567 F. Supp. 591, 598 (M.D. Fla. 1983).

(i)     Distributor Agreement

The parties dispute whether Plaintiff breached the Distributor Agreement by failing to pay Defendant in a timely manner.

Plaintiff's argument is premised on the parties' course of conduct. In April 2010, after executing a refinancing agreement with Bancorp, Plaintiff paid $4.5 million to Defendant. The outstanding balance under the Distributor Agreement after this payment was $5,850,972. (Wiygul Decl. Ex 14.) Plaintiff also provided Defendant with a $1 million letter of credit. In exchange, Defendant terminated the Forbearance Agreement and acknowledged that the Distributor Agreement was in full force and Plaintiff was not in default. (*Id.* Ex. 15.) Defendant also extended Plaintiff a credit line of $6 million.[4] (*Id.* Ex. 16; Second Supp. Teslik Decl. Ex. 3 at 133:13-15, ECF No. 101 (filed under seal).)

Plaintiff argues that the credit line was increased to $6.5 million on December 10, 2010. (Supp. Wiygul Decl. Ex. 2 at 264:15-265:5; *id.* Ex. 3.) Plaintiff asserts that its total credit limit with Defendant included both the $1 million letter of credit and the separate line of credit. (Pl.'s Supp. Br. 2-3, ECF No. 98 (filed under seal).) Plaintiff argues that its maximum allowable balance since December 2010 was therefore $7.5 million, not $6.5 million. (Supp. Wiygul Decl.

---

[4] The Distributor Agreement provides that Defendant may extend credit to Plaintiff "as amended from time to time," but Defendant reserves the right to unilaterally change its credit terms. (Wiygul Decl. Ex. 1 at § 4(a).) A "failure by [Plaintiff] to timely or fully pay according to established credit terms" entitles Defendant to terminate the Agreement. (*Id.* § 4(a).)

Ex. 1 at 230:2-232:16.)

Plaintiff argues that its debt at the time this litigation began was "well within the range tolerated over the course of the parties' relationship." (Pl.'s Opp'n 26.) According to Plaintiff, prior to the April 2010 refinancing agreement, it was required to pay for its fuel within either 10 or 12 days of delivery. After April 2010, however, it was not obligated to make payments within a certain number of days; instead, it only had to maintain its balance below the overall credit limit. (Supp. Wiygul Decl. Ex. 4 at 116:9-117:14.) Plaintiff argues that it was only required to wire money to Defendant as it became available. (Wiygul Decl. Ex. 6 at 117:4-17, 243:21-24.) Morrison testified that "[w]e were working outside of the PMPA agreement." (Wiygul Decl. Ex. 6 at 244:13-16.) Morrison contends that he was never told that Plaintiff was in default. (*Id.* at 236:10-13.)

Defendant responds that it had a reasonable basis under the PMPA to terminate the Distributor Agreement. Defendant maintains that, contrary to Plaintiff's suggestion, Plaintiff did not have "unlimited credit that required [Defendant] to supply fuel in perpetuity." (Def.'s Reply 5, ECF No. 84 (filed under seal).) The Distributor Agreement requires Plaintiff to "pay for all Products, open account items and all other items and services under this Agreement via electronic funds transfer ("EFT"), or by such other methods as [Defendant] may require." (Wiygul Decl. Ex. 1 at § 4(h).)

Defendant contends that Morrison acknowledged that the credit terms between the parties did, in fact, impose a due date. (Supp. Teslik Decl. Ex. 1 at 112:11-15, ECF No. 84 (filed under seal).) The due date changed over the course of the agreement. (*Id.* at 112:21-113:2.) At times payments were due 10 days after delivery, other times 12 days. (*Id.*) Morrison stated that

9

Defendant may suspend the delivery of fuel or terminate its relationship with Plaintiff if the EFT drafts were dishonored. (*Id.* at 114:15-25.) There was testimony that this in fact occurred. The wires were dishonored and Defendant had to pay charges as a result. (Supp. Wiygul Decl. Ex. 2 at 220:2-221:8.) Plaintiff's former chief financial officer, Harvey Hicks, testified that when an amount is not paid during a particular period, it becomes due and payable immediately. (Supp. Teslik Decl. Ex. 2 at 168:13-169:1.)

Defendant also contests Plaintiff's argument regarding the credit limit. Morrison conceded that the credit limit was a "maximum amount beyond which [Defendant] would cease providing fuel." (*Id.* Ex. 1 at 115:11-14.) Logovinsky asserted that Plaintiff was in default when its "credit limit exceeded the amount credit limit." (Second Supp. Teslik Decl. Ex. 3 at 364:6-11.) There is no dispute that Plaintiff's outstanding balance frequently exceeded $7 million in January and February 2011. (Wiygul Decl. Ex. 24.) Thus, even after the credit limit was raised to $6.5 million, Plaintiff often found itself in default. Defendant sent Plaintiff numerous requests to reduce its balance below the credit limit. (Teslik Decl. Exs. 11-13, 15.) Despite these requests, Plaintiff's debt increased to $7.1 million by February 17. (Wiygul Decl. Ex. 24.) Finally, Defendant maintains that the record is devoid of any evidence indicating that Plaintiff's effective credit limit included the extended line of credit—either $6 or $6.5 million—plus the $1 million letter of credit.

We agree with Defendant that Plaintiff failed to pay Defendant the amounts due in a timely manner. It is clear from the deposition testimony that Plaintiff was obligated to maintain its balance below the credit limit. The fact that Plaintiff did not always makes its payments in full—and that they were not always immediately demanded by Defendant—does not transform

10

the Distributor Agreement into a pay-what-you-can contract. Far from staying under its $6 million or $6.5 million credit limit, Plaintiff's balance was well over $7 million in February 2011. Plaintiff carried a past-due balance in the millions of dollars throughout the years 2010 and 2011. (Wiygul Decl. Ex. 24.)

Plaintiff's argument that the credit limit was $7.5 million does not find any support in the record. Plaintiff relies on statements made by Logovinsky for this argument. (Supp. Wiygul Decl. Ex. 1 at 230:2-232:16.) His testimony, however, does not provide any foundation for Plaintiff's position. Logovinsky characterized Plaintiff's balance of $7 million as "outrageous," and when the balance exceeded this threshold, he decided that Plaintiff would need to pay in advance for its fuel or provide further letter of credit. (*Id.*) Logovinsky's testimony in no way suggests that the effective credit limit was either $7 or $7.5 million. Logovinsky consistently testified that the credit limit was approximately $6 million, without any reference whatsoever to the letter of credit. (Second Supp. Teslik Decl. Ex. 3 at 133:13-15, 135:11-22, 154:4-19, 364:6-17.)

In addition, none of the other individuals deposed testified that the $1 million letter of credit must be added to the credit line to calculate the overall credit limit. In fact, all of the depositions, as well as the documentary evidence, clearly demonstrate that the letter of credit does not affect the total credit limit. (*See, e.g.*, Teslik Decl. Ex. 11 (email stating that Plaintiff is "well over the $6,000,000 credit limit"); Second Supp. Teslik Decl. Ex. 4 (email to Morrison stating that he "need[s] to reduce the balance to under $6 million or we will put the account on credit hold").) Plaintiff does not offer testimony from Morrison or Hicks that touches upon this

argument; rather, it relies on an unreasonable interpretation of Logovinsky's deposition.[5]

The record in this case suggests that Defendant simply attempted to work with Plaintiff for several years to preserve the franchise relationship. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 n.19 (11th Cir. 1987) ("The fact that Chevron had been willing in the past to work with Clinkscales to cure arrearages and other violations of the [franchise agreement] does not preclude Chevron from exercising its right to terminate based on this failure to pay sums due."); *see also Cal. Petroleum Distribs. Inc. v. Chevron U.S.A. Inc.*, 589 F. Supp. 282, 288 (E.D.N.Y. 1984). Defendant should not be punished for its efforts to maintain a relationship with a franchisee that was having financial difficulties. Defendant's decision to finally terminate the Distributor Agreement was reasonable in light of all the circumstances. *See Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 673 (3d Cir. 1984) (requiring courts to scrutinize the reasonableness of termination decisions under 15 U.S.C. § 2802(c)).[6]

---

[5] This argument was raised for the first time in Plaintiff's Supplemental Brief in Opposition to Defendant's Motion, which was filed on September 9, just over a week before trial. It should be noted, however, that the parties agreed to proceed with this litigation on an expedited basis. As such, Defendant's Motion for Summary Judgment and Plaintiff's Opposition thereto were filed prior to the depositions of Logovinsky and DeLaurentis, which took place on August 25 and 30, respectively. (Supp. Wiygul Decl. Exs. 1, 2.)

[6] We find additional support for this conclusion in *Rago*. 741 F.2d at 674. In *Rago*, the Third Circuit noted that the question of what constitutes payment in a "timely manner" is intended "to permit evaluation of nonpayment or late payments in view of prevailing commercial or industry trade practices." *Id.* (quoting Senate Report at 896). The court found that the franchisor's "repeated acceptance of late payments over a period of years would suggest that timely payment was not its prevailing trade practice." 741 F.2d at 674. A franchisor's past practices may preclude "it from basing termination on late payments absent any notice that timely payment would be required in the future." *Id.*

Defendant provided notice to Plaintiff that it would not continue to tolerate late payments. Defendant first sought to terminate the franchise in January 2009. In late 2010 and early 2011, Defendant made demands for Plaintiff to keep its balance below the credit limit. In March 2011, the parties attempted to resolve their debt disputes.

12

(ii)    Sublease

Plaintiff argues that even if it breached the Distributor Agreement, Defendant would still not be entitled to terminate the Sublease under the PMPA. The Sublease contains a cross-default provision pursuant to which a default by Plaintiff under the Distributor Agreement constitutes a material breach and default under the Sublease. (Wiygul Decl. Ex. 3 at § 32.) Section 2802(b)(2)(A) of the PMPA provides grounds for termination where there is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." In determining whether a provision is reasonable and material, courts examine "the facts and circumstances surrounding the franchisor's inclusion of the provision in the franchise agreement as well as the franchisee's breach of the provision." *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 334 (11th Cir. 1989).

Plaintiff maintains it would he unfair to terminate the Sublease on account of the outstanding balance for fuel. (Pl.'s Opp'n 28.) The parties agree that Plaintiff has remained current on its rental obligations. (*Id.*) On February 17, 2011, when Logovinsky called Morrison and informed him that the fuel supply would be cut off, he expressly told Morrison to "continue to pay your rent because you'll be renting the facilities from us." (Wiygul Decl. Ex. 6 at 254:13-17.) Plaintiff argues that after Defendant stopped supplying fuel on February 17, Defendant faced no risk that the balance would continue to increase. Moreover, in reliance on Logovinsky's assertion that the Sublease would continue, Plaintiff incurred costs relating to refinancing and finding new fuel suppliers. Plaintiff does not argue that the cross-default provision itself is unreasonable or immaterial on its face. Rather, Plaintiff argues that it would be unreasonable to enforce the provision under these circumstances. We disagree with Plaintiff.

13

It is not disputed that the February 17 phone call did not terminate the Sublease.

Logovinsky told Morrison to continue paying rent. On March 25, however, Plaintiff received a letter from Defendant that purported to terminate the Distributor Agreement, and by cross-default, the Sublease. (Wiygul Decl. Ex. 19.) Upon receipt of this letter, Plaintiff had no reason to continue relying on Logovinsky's February 17 statement. The fact that Defendant initially permitted Plaintiff to continue to maintain the stations does not mean Defendant was barred from subsequently determining that Plaintiff had breached the agreements. Moreover, there is nothing in the Sublease that prevents Defendant from exercising its termination rights even if Plaintiff stays current on its rental payments and Defendant faces no risk of default. Although the Distributor Agreement and Sublease are separate contracts, the cross-default provision allows Defendant to entirely end its franchise relationship with Plaintiff upon a material breach of the Distributor Agreement. This provision is both reasonable and material to the franchise agreement. Plaintiff does not direct our attention to any case that indicates otherwise.

Accordingly, Defendant has established permissible grounds upon which to terminate the Sublease.

(iii)     Actual Grounds for Termination

Plaintiff argues that even if Defendant had a legitimate ground for termination, there remains a triable issue as to whether Defendant did, in fact, terminate the franchise relationship because of the untimely payments. (Pl.'s Opp'n 33-34.) Plaintiff asserts that Defendant's invocation of the PMPA is pretextual. The PMPA requires a franchisor to demonstrate that "termination is based upon a ground" described in the statute. 15 U.S.C. § 2802(b)(1)(B). Plaintiff argues that the "franchisee is free to rebut . . . the franchisor's case by producing

14

evidence that the termination was in fact based on an illegitimate reason." *Reyes Atl. Richfield Co.*, 12 F.3d 1464, 1469-70 (9th Cir. 1993); *accord Chevron U.S.A. Inc. v. SSD & Assocs.*, No. 05-3276, 2006 WL 2619357, at *10 (N.D. Cal. Sept. 12, 2006).

Plaintiff's argument is based on Cambridge's acquisition of Defendant. Lukoil Americas Corporation, which was the parent of Defendant, agreed to sell Defendant to Cambridge Petroleum Holdings, whose principal is Bjorn Aaserod. The stock purchase agreement was signed on February 11, 2011. (Wiygul Decl. Ex. 17 at 41:19-21.) Prior to Cambridge's acquisition, Aaserod decided that he did not want to take over Defendant's wholesale division because it was financially unattractive. (*Id.* at 93:9-94:2.) As such, Defendant agreed to assign most of its wholesale business to Lukoil North America. (*Id.* at 94:15-22.) Plaintiff is the only remaining wholesale customer of Defendant. (*Id.* at 93:9-13.) In addition, according to Morrison, Aaserod complained that the rent Plaintiff paid to Defendant under the Sublease was significantly less than the rent Defendant paid its landlord, Getty Realty, for the same service stations. (*Id.* Ex. 6 at 307:23-308:12.) Based on these facts, Plaintiff contends that Defendant unlawfully terminated the franchise agreement to extricate itself from the wholesale customers and take over the operations of Plaintiff's stations. (Pl.'s Opp'n 36.)

We reject Plaintiff's invitation to consider Defendant's motive. Several courts have addressed this issue and "have found assertions as to improper motive or bad faith by the franchisor to be irrelevant in evaluating the propriety of the termination or nonrenewal where the termination or nonrenewal is based on conduct by the franchisee." *Glenside West Corp. v. Exxon Co., USA*, 761 F. Supp. 1100, 1109 (D.N.J. 1991); *Smoot v. Mobil Oil Corp.*, 722 F. Supp. 849, 856 (D. Mass. 1989) ("Where, as here, a franchisor has a valid reason to terminate a franchise

15

under § 2802(b)(2), the court is not permitted to consider the reasons for the decision to exercise that right."); *see Crown Cent. Petroleum Corp. v. Waldman*, 515 F. Supp. 477, 485 (M.D. Pa. 1981), *aff'd* 676 F.2d 684 (3d Cir. 1982).

In *Smoot*, the court reviewed the language of the PMPA and found that it only required good-faith conduct in four specific contexts.[7] Neither 15 U.S.C. § 2802(b)(2)(A) nor § 2802(b)(2)(C)—the two provisions that Defendant relies upon—mentions good faith or motive. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citations omitted).

In *Crown Central*, the franchisee argued that the franchisor was relying on the PMPA "as a subterfuge for its true desire to take over a profitable, independently operated service station." 515 F. Supp. at 484. The court dismissed this argument. "When termination is predicated on actions by the franchisee, and not by the franchisor, the need to avoid sham justifications for the franchisor's decisions to terminate the franchise is drastically reduced." *Id.* at 485; *see also Doebereiner v. Sohio Oil Co.*, 683 F. Supp. 791, 795 (S.D. Fla. 1988); *Shell Oil Co. v. Babalis*, No. 93-6352, 1994 WL 411733, at *6-7 (N.D. Ill. Aug. 4, 1994).

Since Defendant has established a ground for termination found in the PMPA based on the conduct of Plaintiff, we need not evaluate Defendant's subjective intentions. We reject

---

[7] Good faith is required where termination is based on: (1) withdrawal from the marketing territory, 15 U.S.C. § 2802(b)(2)(E); (2) failure to agree to changes or additions to the franchise agreement, § 2802(b)(3)(A); (3) economic reasons related to the site itself, § 2802(b)(3)(D); and (4) the franchisor's loss of the right to grant the use of its trademark, § 2802(c)(6). *Smoot*, 722 F. Supp. at 856; *Glenside*, 761 F. Supp. at 1109 & n.12.

16

Plaintiff's argument to the contrary.[8] Accordingly, we are satisfied that 15 U.S.C.

§ 2802(b)(2)(C) and § 2802(b)(2)(A) provided Defendant with a permissible basis to terminate the Distributor Agreement and Sublease.

### 2.    February 17 Phone Call

The parties dispute whether Defendant terminated a franchise agreement within the meaning of the PMPA following the February 17 phone call between Logovinsky and Morrison. Plaintiff argues the fuel cut off was a termination; Defendant contends it was a suspension.

The PMPA only governs "franchisor conduct that has the effect of ending a franchise." *Mac's Shell*, 130 S. Ct. at 1257. In *Mac's Shell*, after defining the word "terminate" to mean "put an end to" or "annul or destroy," the Supreme Court held that the PMPA is violated only if "an agreement for the use of a trademark, purchase of motor fuel, or lease of a premise is 'put [to] an end' or 'annul[ed] or destroy[ed].'" *Id.*; *see Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 859 (7th Cir. 2002) (finding that the PMPA covers termination of any of the three statutory components of the franchise agreement). Conduct that does not force an end to the franchise is not prohibited. *Mac's Shell*, 130 S. Ct. at 1257-58.

Plaintiff argues that Logovinsky told Morrison on their phone call that "we can't supply

---

[8] Even assuming that it is appropriate to inquire into Defendant's motive, it is clear that the termination here was, in fact, based upon a ground in the PMPA. *See* 15 U.S.C. § 2802(b)(1)(B). Over the course of a difficult two years, Plaintiff consistently owed Defendant millions of dollars. Defendant sought to terminate the franchise in 2009, but decided to proceed with the relationship after Plaintiff borrowed $27 million from Bancorp. Defendant demanded immediate payment from Plaintiff when it exceeded the credit limit. Defendant decided to stop providing fuel to Plaintiff when its outstanding balance was almost $700,000 above the credit limit. These facts demonstrate that the termination was based upon a ground in the statute—namely, failure to make timely payments.

17

you product anymore." (Wiygul Decl. Ex. 6 at 254:3-5.) Asked for an explanation, Logovinsky responded, "I can't tell you. We just can't supply you product anymore. You'll have to go out and find your own source." (*Id.* at 254:6-11.) Logovinsky stated that Morrison should continue to pay rent for the stations, but the supply would be shut off at midnight. (*Id.* at 254:12-24.) The phone call lasted five minutes. Morrison then called DeLaurentis, who advised that he was under a confidentiality agreement and could not provide any information. (*Id.* at 255:12-17.) Morrison never spoke again to Logovinsky or DeLaurentis about the fuel supply. (*Id.* at 257:8-12.) Plaintiff argues that Logovinsky's statement on the phone call, which was made without conditions, terminated the Distributor Agreement for the purchase of motor fuel.

Defendant offers several responses. The Distributor Agreement provides that in the event of a default, Defendant may "suspend all deliveries of Products to [Plaintiff] until the default is corrected or remedied." (Wiygul Decl. Ex. 1 at § 17(c).) Defendant may suspend delivery without exercising its right to terminate. (*Id.*) Defendant contends that it did not terminate "an *agreement* for the . . . purchase of motor fuel." *See Mac's Shell*, 130 S. Ct. at 1257 (emphasis added). It was enforcing its contractual right to suspend delivery. Moreover, Logovinsky testified that after his phone call with Morrison, he spoke with David Wallace, Defendant's senior vice president. (Supp. Wiygul Decl. Ex. 1 at 231:4-17.) Logovinsky told Wallace that Defendant was suspending Plaintiff's fuel supply unless Morrison prepaid or posted a new letter of credit.[9] (*Id.*) In addition, Defendant's plan to continue leasing service stations to

---

[9] Unfortunately, the record before us does not include Logovinsky's testimony concerning the content of the February 17 phone call to Morrison. The record does indicate that Logovinsky advised that Defendant was going to suspend fuel as of January 17. Reading this statement in context, it is clear that Logovinsky meant February 17.

Plaintiff manifested its intent to continue the franchise relationship. Finally, Defendant notes that Plaintiff has admittedly suspended delivery on several occasions to its dealers when they have defaulted. (Supp. Teslik Decl. Ex. 2 at 67:21-68:12.)

There is a genuine issue of material fact as to whether the cessation of fuel delivery following the February 17 phone call constitutes a suspension or termination. Although Defendant may certainly suspend delivery under the Distributor Agreement without contravening the PMPA, the parties vigorously contest Defendant's intent when it stopped supplying fuel in this case. According to Morrison, Logovinsky tersely stated that Defendant "can't supply" fuel anymore. There was no explanation provided or any intimation that the fuel supply would continue at a later date if the default was remedied. Furthermore, Defendant's agreement to continue the Sublease does not foreclose a finding that Defendant terminated the Distributor Agreement. The PMPA covers the termination of an agreement for the purchase of motor fuel, *Mac's Shell*, 130 S. Ct. at 1257, regardless of the franchisor's acts with respect to the other statutory components. Finally, Aaserod's testimony regarding his desire to rid Defendant of its wholesale division may bear on whether the February 17 phone call was a termination or suspension.

### 3. Notice Requirements[10]

In addition to stating a substantive ground for termination, a franchisor must comply with the notice requirements of the PMPA to validly terminate a franchise. 15 U.S.C. § 2802(b)(1)(A). Section 2804(a) provides that prior to the termination of any franchise

---

[10] The parties agree that Defendant did not comply with the notice requirements following the February 17 phone call. Defendant only argues that this was a suspension and was therefore not governed by the PMPA.

19

relationship, the franchisor shall furnish notification of such termination to the franchisee. The notice must be in writing and must contain a statement providing the reasons for termination and a summary statement from the Department of Energy. *Id.* § 2804(c). A franchisor is required to provide notice at least 90 days prior to the date on which termination takes effect. *Id.* § 2804(a)(2). However, the 90-day notice requirement does not apply if "it would not be reasonable for the franchisor to furnish [such] notification." *Id.* § 2804(b)(1). Nevertheless, the franchisor must still provide notice "on the earliest date" that is "reasonably practicable." *Id.* § 2804(b)(1)(A). The "90-days notice ordinarily required by the PMPA should not be lightly excused." *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2d Cir. 1984).

Section 2802(b)(2)(C) provides that a franchisor may terminate a franchise upon the occurrence of a relevant event if the "franchisor first acquired actual or constructive knowledge of such occurrence" not more than 60 or 120 days prior to notification of termination. If the franchisor gives 90 days' notice, then it must act within 120 days of acquiring knowledge of the relevant event. *Id.* § 2802(b)(2)(C)(i). If the franchisor gives less than 90 days' notice, it must act within 60 days of acquiring knowledge. *Id.* § 2802(b)(2)(C)(ii). The purpose of this provision is to prevent franchisors from using "stale events or violations to which it has acquiesced as later grounds for termination of the franchise." *Cal. Petroleum*, 589 F. Supp. at 287.

### (i) Shortened Notice

In early March 2011, the parties unsuccessfully attempted to resolve the issues surrounding Plaintiff's outstanding balance. (Aaserod Decl. ¶¶ 13-19; Supp. Teslik Decl. Ex. 1 at 299:8-16, 308:17-309:25.) On March 25, Plaintiff received a termination notice for the

20

Distributor Agreement and Sublease effective April 25. (Wiygul Decl. Ex. 19.) Plaintiff was provided thirty days to surrender the premises. After Plaintiff received the letter, Morrison and Aaserod spoke on the telephone. (*Id.* Ex. 6 at 312:22-313:20.) Morrison advised Aaserod that Plaintiff had hired a restructuring firm named Phoenix and that he would present Defendant with a business plan by April 15. (*Id.* at 313:8-22; Supp. Teslik Decl. Ex. 10 at 221:21-222:10.) Aaserod received no communication from Morrison between that phone call and April 11. (Supp. Teslik Decl. Ex. 10 at 223:5-20.) After reviewing the situation, Aaserod determined that Plaintiff may be planning to file for bankruptcy.[11] (*Id.*) Based on this concern, Defendant sent Plaintiff another notice on April 11 that terminated the Distributor Agreement, Sublease, and Credit Card Agreement effective immediately. (Wiygul Decl. Ex. 20.)

Plaintiff argues that the March 25 and April 11 letters violated the PMPA because they did not provide 90 days' notice and there were no circumstances that justified shorter notice. Plaintiff argues that the parties do not dispute that between February 17 and April 11, Plaintiff's outstanding balance did not increase. (*Id.* Ex. 24.) It decreased by more than $1 million. (*Id.*) The account balance at the time of the March 25 notice, $6,080,435, was similar to the balance following the April 2010 refinancing, $5,850,972, after which, Defendant deemed Plaintiff not in default. Plaintiff argues that by cutting off its fuel supply, Defendant largely eliminated the prospect of Plaintiff increasing its outstanding balance. Finally, Plaintiff maintains that the

---

[11] As it turns out, Plaintiff's own documents confirm Aaserod's suspicions. On April 4, 2011, Plaintiff made a presentation to Bancorp in which it stated, "[i]n the event that an injunction is not issued prior to April 25, 2011, [Plaintiff] will seek to protect its lease position by filing for bankruptcy protection." (Supp. Teslik Decl. Ex. 11.) Defendant does not argue, however, that any of its employees were aware of this statement at the time the April 11 termination notice was issued.

21

longstanding nature of the account balance counsels against Defendant's position.

Defendant points out that the only reason the outstanding balance was reduced from $7.1 million, on February 17, to $6 million, on March 25, was because Defendant stopped supplying fuel and exercised its right to offset the debt with credit card receipts. After Defendant cut off Plaintiff's fuel supply on February 17, it continued to collect credit card receipts from Plaintiff's stations. (Wallace Decl. ¶ 13.) However, by March 1, Plaintiff had reprogrammed all of its credit card processing equipment thereby preventing Defendant from collecting credit card receipts. (*Id.* at ¶ 11.)

Defendant cites several cases and argues that shorter notice is appropriate here. *Zipper v. Sun Co.*, 947 F. Supp. 62, 69 (E.D.N.Y. 1996) ("[W]here a franchisor would suffer large additional deficiencies if it provided 90 days notice to a franchisee, it is reasonable to provide less than 90 days notice."); *Murphy Oil USA, Inc. v. Brooks Hauser*, 820 F. Supp. 437, 443 (D. Minn. 1993) (finding shorter notice appropriate where franchisee's balance increased after it received 90 days' notice); *Loomis*, 567 F. Supp. at 597 (same); *Cal. Petroleum*, 589 F. Supp. at 289 (finding shorter notice proper where franchisor demanded payment for four months).

We find that the 30-day notice in the March 25 notice was reasonable. In the months preceding the fuel cut off, Defendant made numerous demands for Plaintiff to reduce its balance below the credit limit. (Teslik Decl. Exs. 11-13, 15.) Demands notwithstanding, from February 17 through March 25, the account balance exceeded $6.5 million. (Wiygul Decl. Ex. 24.) On February 21, the balance reached a high mark of almost $7.5 million. (*Id.*) Although the balance decreased overall from February 17 to March 25, it did fluctuate—a trend that justifies a "franchisor's legitimate fear" that the franchisee's operations would founder. *See Zipper*, 947 F.

22

Supp. at 69. Moreover, contrary to Plaintiff's suggestion, the longstanding nature of the outstanding balance weighs in favor of shortened notice. Defendant first initiated the termination procedure in January 2009, when Plaintiff owed Defendant over $10 million and had an overdue balance of $4.1 million. Following the refinancing agreement with Bancorp in April 2010, Plaintiff's balance hovered around $6 million. (Wiygul Decl. Ex. 24.) Defendant agreed to increase the credit limit to $6.5 million in December. (Supp. Wiygul Decl. Ex. 3.) Beginning in January 2011, however, the balance was consistently above $7 million. Defendant was not required to sit idly by while Plaintiff's substantial indebtedness continued to grow.

The immediate termination in the April 11 notice is also reasonable. Aaserod made an appropriate, and perfectly justified, business decision to immediately end the franchise relationship based on his belief that Plaintiff had hired a restructuring firm in preparation for bankruptcy. In early April, Plaintiff's outstanding balance ranged from $5.8 million to just under $6.1 million. (Wiygul Decl. Ex. 24.) Aaserod understandably feared Plaintiff's imminent bankruptcy would pose a significant impediment to Defendant's recovery of the balance. Plaintiff had already refinanced its operations in April 2010, when Bancorp provided Plaintiff with $27.4 million in loans and credit. (Teslik Decl. Ex. 9.) Despite this refinancing, Plaintiff's financial condition continued to languish. Plaintiff owed Defendant millions of dollars. Plaintiff was never able to pay off its substantial past due balance. Plaintiff owed Bancorp millions of dollars. Under these circumstances, Plaintiff's consultation with a restructuring firm more than justified Aaserod's belief that bankruptcy was a possibility.

(ii)     Timeliness

Plaintiff argues that the March 25, April 11, and June 3 terminations were untimely

23

because they were issued more than 60 or 120 days after Defendant acquired knowledge of a relevant event. 15 U.S.C. § 2802(b)(2)(C). Plaintiff argues the evidence establishes that Defendant was aware of Plaintiff's outstanding balance far more than 120 days before it issued any of the termination letters. Following Plaintiff's payment of $4.5 million to Defendant in connection with the Bancorp refinancing in April 2010, Plaintiff's outstanding balance was $5,850,972. Plaintiff argues that its balance remained "relatively constant" thereafter, and was actually slightly less, $5,839,753.17, at the time this litigation began. (Pl.'s Opp'n 41-42.)

Defendant argues that its notices were timely because Plaintiff continued to be in default within the statutory period. Defendant submits numerous emails, dated October 2010 through January 2011, in which it requested that Plaintiff reduce its balance below the $6 million credit limit. (Teslik Decl. Exs. 11-13, 15.) In March 2011, in a discussion between Aaserod and Morrison, it is undisputed that Defendant offered to settle the outstanding debt, but Plaintiff refused. (Aaserod Decl. ¶¶ 13-19; Supp. Teslik Decl. Ex. 1 at 299:8-16, 308:17-309:25.)

Defendant argues that each day a franchisee fails to make timely payments constitutes a new "event" within the meaning of the PMPA. *See Chevron U.S.A., Inc. v. Finn*, 851 F.2d 1227, 1231 (9th Cir. 1988) ("[W]here there are multiple violations of the lease, each violation constitutes a separate ground for termination."); *Wisser*, 730 F.2d at 59-60 (finding continuous misbranding of gasoline not within the PMPA time bar); *Cal. Petroleum*, 589 F. Supp. at 287-88 (finding continuing defaults not within the PMPA time bar); *Kajdan v. Exxon Co., U.S.A.*, No. 80-126, 1980 WL 1816, at *8 (D. Conn. Mar. 14, 1980) ("The repeated occurrence of such continued non-compliance within the 120-day period fully justifies nonrenewal or termination."). According to its legislative history, the time limitations in the PMPA are "not intended to stop a

24

franchisor from exercising termination . . . rights based upon a future event . . . if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or nonrenewal rights was waived." *Rago*, 741 F.2d at 674 (citing Senate Report at 892).

Plaintiff argues, however, that the "continuing violation" doctrine is not viable in the Third Circuit. Plaintiff cites language in *Rago* to support this contention. *See* 741 F.2d at 674 ("[T]here is a serious question under the PMPA whether Sun's past practices precluded it from basing termination on late payments absent any notice that timely payment would be required in the future."). Moreover, Plaintiff attempts to distinguish several of the cases cited by Defendant, including *California Petroleum* and *Kajdan*, by arguing that those cases involve delinquent payments, in contrast to Plaintiff's credit terms, which did not impose timing requirements.

We agree with Defendant that it gave timely notice of termination. Even though Defendant was aware of events that gave rise to its right to terminate as early as 2009, there were also events in the relevant time period. Morrison acknowledged that the credit limit was a "maximum amount beyond which [Defendant] would cease providing fuel." (Supp. Teslik Decl. Ex. 1 at 115:11-14.) Yet Plaintiff's daily balance in February 2011 often exceeded $7 million. (Wiygul Decl. Ex. 24.) In addition, the language in *Rago* does not support Plaintiff's argument. Unlike the franchisee there, Plaintiff was frequently placed on notice that late payments could not continue indefinitely. In January 2009, Defendant threatened to terminate the franchise because of the debt; in October 2010 through January 2011, Defendant sent Plaintiff credit exposure reports demanding that Plaintiff make appropriate payments; and in March 2011, Aaserod unsuccessfully attempted to negotiate a debt settlement with Morrison. Plaintiff's "failure to pay

25

amounts past due constitutes an ongoing default." *See Cal. Petroleum*, 589 F. Supp. at 288.

Accordingly, Defendant's termination notices dated March 25, April 11, and June 3 were all timely.

## B. Defendant's Counterclaims

Defendant argues that it is entitled to summary judgment on its counterclaims for (1) breach of the Distributor Agreement, (2) breach of the Sublease, and (3) breach of the Credit Card Agreement.

### 1. Distributor Agreement

For the reasons stated above, Plaintiff breached the Distributor Agreement. Plaintiff was required to "pay for all Products, open account items and all other items and services." (Wiygul Decl. Ex. 1 at § 4(b).) A "failure by [Plaintiff] to timely or fully pay according to established credit terms" entitles Defendant to "terminate this Agreement" and exercise any other rights it "may have under this Agreement or at law." (*Id.* § 4(a).) Plaintiff breached the Distributor Agreement by failing to timely pay for fuel. David Wallace, Defendant's senior vice president of operations and marketing, advises that as of August 11, 2011, Plaintiff's outstanding balance, without interest, was $6,490,055. (Wallace Decl. ¶ 14.) And Defendant has not supplied fuel to Plaintiff for months.

Plaintiff argues that there was no breach of the Distributor Agreement. (Pl.'s Opp'n 43 ("For the reasons given above . . . [Defendant] has failed to demonstrate undisputed facts showing that [Plaintiff] breached the Distributor Agreement.").) We have rejected this argument. Plaintiff "acknowledges that it has an outstanding balance owed to [Defendant] for purchases of motor fuel." (*Id.* at 43 n.105.) It attempts to avoid summary judgment by arguing that

26

"[b]ecause this sum will he offset by the damages to which [Plaintiff] is entitled as a result of [Defendant's] PMPA violations, the precise amount owed cannot be determined by summary judgment." (*Id.*) We reject this argument. Assuming Plaintiff prevails on its PMPA claims regarding the February 17 termination and is entitled to damages with respect thereto, any offset can be determined when entering a final judgment.

Plaintiff has not offered any evidence that disputes Wallace's statement regarding the amount that Plaintiff owes to Defendant. Accordingly, Defendant is entitled to summary judgment on its counterclaim for breach of the Distributor Agreement and will be awarded \$6,490,055 plus interest.

### 2. *Sublease*

As noted above, the breach of the Distributor Agreement triggered the cross-default provision in the Sublease. (Wiygul Decl. Ex. 3 at § 32.) In the event of a default, Defendant may cancel the Sublease and take possession of the leased stations. (*Id.* § 25.1.) Plaintiff responds that Defendant is not entitled to cancel the Sublease and take possession of the stations because of its failure to comply with the substantive and procedural strictures of the PMPA. Plaintiff relies on its previous arguments.

We have found that Defendant had substantive grounds for termination and complied with the PMPA's notice requirements with its termination letters dated March 25, April 11, and June 3. Although there is a genuine issue of material fact as to whether Defendant unlawfully terminated the Distributor Agreement on February 17, this does not preclude summary judgment on Defendant's counterclaim. *See Escobar v. Mobil Oil Corp.*, 678 F.2d 398, 400 (2d Cir. 1982) ("Escobar's right to contest the efficacy of the first notice does not entitle him to avoid the effect

27

of the second notice."); *Zipper*, 947 F. Supp. at 69 n.2. Therefore, Defendant is entitled to cancel the Sublease and take possession of the 75 stations.

### 3. *Credit Card Agreement*

Defendant argues that Plaintiff breached the Credit Card Agreement. We need not address this issue. Defendant does not seek any damages on this claim that are in addition to its damages for the breach of the Distributor Agreement. (Mot. Summ. J. 24 n.11.)

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion will be granted in part and denied in part. An appropriate Order follows.

BY THE COURT:

R. BARCLAY SURRICK, J.